IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 25, 2019 Session

**STATE OF TENNESSEE v. BUFORD TRAMMELL**

**Appeal from the Criminal Court for Knox County
No. 106715   Steven Wayne Sword, Judge**

———————————————————

**No. E2018-00382-CCA-R3-CD**

———————————————————

A Knox County jury convicted the Defendant, Buford Trammell, of six counts of rape, three counts of statutory rape by an authority figure, one count of solicitation of a minor, one count of casual exchange of a controlled substance, and one count of sexual battery by an authority figure.  After merging the appropriate convictions, the trial court ordered an effective sentence of twenty years in the Tennessee Department of Correction.  On appeal, the Defendant asserts that there is insufficient evidence to sustain the jury's verdict and that the trial court erred when it imposed consecutive sentences.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Mark E. Stephens, District Public Defender, and Jonathan P. Harwell (on appeal), Assistant Public Defender, Knoxville, Tennessee, and Michael G. Hatmaker (at trial), Jacksboro, Tennessee, for the appellant, Buford E. Trammell.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Joan S. Stewart, and Rachel D. Russell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's sexual contact with a minor.  A Knox County grand jury indicted the Defendant for six counts of rape, three counts of statutory rape by an authority figure, two counts of solicitation of a minor, one count of casual

exchange of a controlled substance, one count of sexual battery by an authority figure, and one count of attempted casual exchange of morphine.[1] At trial, the parties presented the following evidence: The seventeen-year old victim identified the Defendant as her "rapist." The victim said that she had first met the Defendant at the age of four when her mother and the Defendant began dating and that the Defendant assumed a parental role with her.

The victim testified that the Defendant and her mother ended their relationship when the victim was in the sixth grade; however, the Defendant maintained a relationship and role in the victim's life. The victim spent weekends with the Defendant during which he would feed and "take care" of her. He provided some financial support as well, buying her clothes and school supplies. About the Defendant, the victim stated, "He was like a dad."

The victim testified that on November 24, 2014, she drove the Defendant to Cookeville, Tennessee, as she did every month, for a doctor appointment. On the drive back, the Defendant repeatedly offered the victim "Percocet." The victim declined, but the Defendant persisted. The Defendant had an appointment for an MRI the following day in Knoxville, so the victim and the Defendant stayed in a hotel in the Knoxville area. After checking in to room 217 at the hotel, the Defendant and the victim drove to a nearby Walmart to buy clothing and toiletries for their stay because the decision to get a hotel room in Knoxville had been "spur of the moment." Once back in the room, they ordered pizza. The Defendant helped the victim dye her hair before he again began to offer the victim "Percocet." The victim acknowledged that the Defendant had given her "Percocet" "in the past" and that she had taken "[j]ust 10s."

The victim testified that the Defendant continued to "pester" her and finally she "gave in" because she could not "take it anymore." As the victim prepared to take the "Percocet," the Defendant told the victim to "snort it." The Defendant watched as the victim snorted the "first one," and then they sat and talked while watching television. The Defendant offered the victim a second "Percocet," and the victim declined. When the Defendant offered again, the victim said that she "just went ahead and done it." The victim described the "Percocet" pill as a blue "30" and said that the Defendant obtained the pills from the doctor's office in Cookeville. She said that she used a rolled up piece of paper to snort the "Percocet."

The victim testified that she had a cell phone that one of her mother's friends had given her. If she had internet access, she could use the phone to send text messages;

---

[1] Before trial, the State entered a nolle prosequi as to the last count of the indictment, attempted casual exchange of morphine.

however, she could not make phone calls with the cell phone. The victim recalled that she and the Defendant were lying on the bed in the hotel room when he sent her a text message that read, "Show me, LOL." The victim identified a copy of the text messaging that occurred between the Defendant and her that night. The victim recalled asking the Defendant what the message meant, and he told her that he was referring to her breasts. The following text message exchange then occurred:

| | |
|---|---|
| The victim: | Uhhhhh no |
| The Defendant: | Say What??? |
| The Defendant: | Wrong wrong wrong.!!!! |
| The victim: | Shut up and go to bed! |
| The Defendant: | I'm n bed answer me beautiful…. |
| The victim: | Go to sleep! |
| The Defendant: | I will when you answer me NOW go ahead….. |
| The victim: | I said no!!!! |

The victim testified that by this point in the evening, she was feeling tired due to the "Percocet." When asked if she fell asleep, the victim responded, "I thought I did until . . . I remember waking up or I guess coming to, and I was on top of him in the 69 position." She stated that when she realized what was occurring, she "got off of him and went to bed." The victim confirmed that the Defendant had his mouth on her vagina and that his flaccid penis was inside her mouth.

The victim testified that she was "sick, "grossed out," and did not know what to do. She fell asleep again and when she awoke, she had no clothing on and the Defendant's fingers were inside her vagina, and his other hand was on her breast. She said that the Defendant was awake and told her that she "needed to start covering up [her] nipples when [she] was in the tanning bed, because he didn't like them dark." The victim got out of bed, went to the bathroom where she dressed, and walked downstairs to smoke. Once downstairs she "got sick, and . . . threw up."

The victim testified that she returned to the room and again fell asleep. When she woke up, the Defendant was talking to the victim's mother on the phone. He told the victim's mother that he was not going to his appointment that day. The two dressed and

prepared to leave the hotel. The victim was to drive them home, but she was "too sick" and the Defendant drove instead. The victim fell asleep in the car and woke up when the Defendant parked at a mall. The Defendant went inside the West Town Mall to a Spencer's store. They then continued their drive to the Defendant's residence where the victim spent the night. The following morning, the victim learned what the Defendant had purchased. The Defendant told the victim to come to his room to try on lingerie he had bought for her from Spencer's.

The victim testified that the Defendant would not allow her to call her mother so she was unable to speak to her mother until later that day when her mother picked her up. The victim recalled that, after arriving at her mother's house, she worked up the courage to tell her mother what had occurred. She said that her mother was "mad" and called the Oneida Police Department to report the Defendant. The investigators asked the victim to call the Defendant "[t]o try to get him to admit to what he [had] done."

On cross-examination, the victim testified that she was fifteen years old at the time of these events. She confirmed that she was concerned she would "get in trouble with the probation" for taking the Percocet. She stated that before the November 24, 2014 incident, she had taken "Percocet 10" four or five times but that the incident in the hotel was the first time she had ever taken "Percocet 30." The victim agreed that, during the taped telephone conversation with the Defendant, he denied "doing anything to" the victim. She confirmed that the contact at the Knoxville hotel was the only time the Defendant "ever did anything" to her.

JKL, the victim's mother, testified that the Defendant and the victim were "real close" and that the Defendant acted as a father figure to the victim. JKL initially encouraged their relationship. She did not anticipate, however, that when her long-term relationship with the Defendant ended, the Defendant would want to continue being involved in the victim's life. The victim, viewing the Defendant as her "dad," also wanted to continue her relationship with the Defendant, so JKL allowed it.

JKL recalled that in November 2014, the victim went to stay with the Defendant for a few days. She was unaware that the victim drove the Defendant to an appointment in Cookeville until after the incident. She said that she spoke with the Defendant over the phone during the time the victim was with the Defendant but that when she would ask to speak with the victim, the Defendant would tell her that they would call back later. JKL testified that during one phone call she heard the victim in the background saying she wanted to go home, so JKL insisted that the Defendant meet her at a gas station "right then." When she saw the victim, the victim was "really quiet." JKL asked the victim what was wrong and the victim said "nothing." JKL said that the victim was usually very talkative when she returned from visiting the Defendant, filling JKL in on what they had

- 4 -

done and talked about together. After they got home, JKL prepared dinner and then called the victim to the kitchen to eat. JKL again asked the victim what was wrong. This time the victim responded to JKL's question. As the victim relayed what had occurred, the victim became "[h]ysterical." As a result of what the victim told her, JKL drove the victim to the police station.

Knoxville Police Department Investigator Keith Johnson testified that, on December 16, 2014, he received this case through a referral from the Department of Children's Services. The preliminary investigation had been conducted by the Oneida Police Department. Investigator Johnson learned that the victim had been interviewed. Investigator Johnson received and reviewed a copy of the interview. He then began to investigate various aspects of the victim's statement about the incident. First, he confirmed that the Defendant had an appointment at a pain clinic in Cookeville. Investigator Johnson identified a document he had obtained from a prescription database that showed the facility where the Defendant was receiving treatment, a treatment date of November 24, 2014, and the medications prescribed which included thirty milligram tablets of oxycodone. Investigator Johnson explained that during the course of his investigation he learned that the difference between oxycodone and Percocet is that Percocet also contains acetaminophen. He also learned that Percocet does not come in thirty milligram tablets.

Investigator Johnson testified that he confirmed the Defendant's stay at the hotel the victim had identified, Spring Hill Suites. Investigator Johnson identified documentation from the hotel showing when the Defendant checked in to the hotel with the use of a credit card. While at the hotel, the investigator viewed the room to compare it with the victim's description. Photographs of the room were shown to the jury.

Investigator Johnson testified that he also went to the nearby Walmart and obtained surveillance footage that showed the victim driving the car into the Walmart parking lot. Additional surveillance footage showed the Defendant and the victim entered the Walmart at 8:06 p.m. Investigator Johnson also obtained a receipt of the Defendant's purchases, which coincided with the victim's account of what items had been purchased for their overnight stay. Investigator Johnson obtained records from a Papa John's located on Kingston Pike that confirmed delivery of a pizza to room 217 at the Spring Hill Suites that had been ordered at around 9:40 p.m. Investigator Johnson also obtained surveillance video footage showing the Defendant inside the Spencer's store at West Town Mall and a receipt confirming his purchase. The State played the recording for the jury, and the recording showed the Defendant selecting lingerie. Investigator Johnson identified the Spencer's receipt for purchased items that included sexual lubricant and lingerie.

Investigator Johnson testified that he asked the victim to participate in a recorded telephone call with the Defendant and she agreed. During the phone call, the Defendant denied any sexual contact with the victim and responded by accusing the victim of stealing his pills. He further denied going to the Spencer's at West Town Mall and purchasing any items. Investigator Johnson testified that he collected the victim's cellular phone and submitted the phone for analysis. The text messages from the phone were accessed and photographed. As part of his investigation, Investigator Johnson obtained the Defendant's birth date and determined that he was fifty-three years old at the time of these events.

At the close of the State's proof, the defense made a motion for a judgment of acquittal as to all charges. After hearing from the parties, the trial court granted the motion for acquittal as to the charge of solicitation of a minor to commit especially aggravated sexual exploitation of a minor but denied the motion as to all other counts.

After hearing the evidence, the jury convicted the Defendant of: six counts of rape, a Class B felony; three counts of statutory rape by an authority figure, a Class C felony; one count of solicitation of a minor, a Class C felony; one count of casual exchange of a controlled substance to a minor, a Class C felony; and one count of sexual battery by an authority figure, a Class C felony. As to the rape convictions, the trial court merged: Count 2 – rape by cunnilingus when the victim is physically helpless with Count 1 – rape by cunnilingus without consent; Count 5 rape by fellatio when the victim is physically helpless with Count 4 – rape by fellatio without consent; and Count 8 – rape by digital penetration when the victim was physically helpless with Count 7 – rape by digital penetration without consent. Following a sentencing hearing, the trial court ordered partial consecutive sentencing for an effective sentence of twenty years in the Tennessee Department of Correction. It is from these judgments that the Defendant appeals.

## II. Analysis

The Defendant asserts that the evidence is insufficient to support the jury's verdicts and challenges his effective sentence as excessive. The State asks this court to affirm the judgments in all respects.

## A. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence. Specifically, he argues that there is insufficient evidence to prove that there was a lack of consent (Counts 1 and 4) and that the victim was physically helpless (Counts 2 and 5). He further asserts that the State failed to prove that the Defendant used a position of trust to accomplish the offenses (Counts 3, 6, 9 and 12). The State responds that the evidence, viewed in the

light most favorable to the State, is sufficient beyond a reasonable doubt to support the jury's verdicts.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

- 7 -

atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

**1. Rape**

As it relates to this case, rape is defined as "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" where "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent" or "[t]he defendant knows or has reason to know that the victim is . . . physically helpless." T.C.A. § 39-13-503(a)(2), (3). The term "sexual penetration" means "sexual intercourse, cunnilingus, fellatio . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, [or] the defendant's . . . body." *Id.* § 39-13-501(7). A "physically helpless" person is "unconscious, asleep or for any other reason physically or verbally unable to communicate unwillingness to do an act." *Id.* § 39-13-501(5).

Counts 1 and 4 of the indictment charged the Defendant with rape by cunnilingus and fellatio, respectively, without the victim's consent. As to these two counts the Defendant argues that the State failed to prove that the victim did not consent to the acts because the State never expressly asked the victim whether she consented to the acts.

The evidence, viewed in the light most favorable to the State, proved that on the drive back from a doctor appointment in Cookeville, the fifty-three year old Defendant and the fifteen-year old victim stayed in a hotel room together in Knoxville because the Defendant had another medical appointment in Knoxville the following day. The Defendant urged the victim to "snort" a 30 milligram oxycodone pill acquired that day at his doctor appointment. The victim declined but ultimately took one of the pills and, after a period of time and at the Defendant's encouragement, took another pill. As the Defendant and the victim lay on the bed in the hotel room, the Defendant sent the victim a text stating, "Show me." The Defendant clarified to the victim that his text message

referenced her breasts. The victim responded with a text message stating "no"; however, the Defendant persisted. The victim told the Defendant to go to sleep and again stated in a text, "No" to his request. The victim recalled feeling drowsy due to the oxycodone, then "waking up or . . . coming to" on top of the Defendant in the "69" position. The Defendant's penis was in her mouth, and his mouth was on her vagina. The victim rolled off and away from the Defendant. She testified that she felt "sick, "grossed out," and did not know what to do. From this evidence, a rationale jury could conclude that the Defendant knew or should have reasonably known that after expressly declining sexual advances by the Defendant, the unconscious victim did not give consent to engage in cunnilingus or fellatio with the Defendant.

Counts 2 and 5 of the indictment charged the Defendant with rape by cunnilingus and fellatio, respectively, when the Defendant knew or had reason to know that the victim was physically helpless. The Defendant contends that the victim's vague testimony about her actual state upon realizing the position she was in with the Defendant undermines the State's evidence.

The evidence, viewed in the light most favorable to the State, proved that the Defendant repeatedly urged the fifteen-year old victim to take a thirty milligram oxycodone pill prescribed to him. She declined, but the Defendant persisted and eventually convinced the victim to "snort" the pill. Later, the Defendant began encouraging the victim to take a second pill. The victim testified that, after taking the drugs, she declined sexual advances by the Defendant. She recalled feeling drowsy due to the sixty milligrams of oxycodone and then "waking up or . . . coming to" on top of the Defendant in a "69" position. The victim got off the Defendant and moved away from him. A jury could reasonably conclude that the Defendant, who provided a minor with sixty milligrams of oxycodone, knew or had reason to know that, due to the effects of the oxycodone, the victim was unable to communicate unwillingness to engage in the conduct.

Accordingly, we conclude that the evidence supports the Defendant's convictions for rape. The Defendant is not entitled to relief.

### 2. Statutory Rape by an Authority Figure

As relevant to this case, Tennessee Code Annotated section 39-13-532(a) provides:

Statutory rape by an authority figure is the unlawful sexual penetration of a victim by the defendant or of the defendant by the victim when:

(1) The victim is at least thirteen (13) but less than eighteen (18) years of age;

(2) The defendant is at least four (4) years older than the victim; and

(3) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration[.].

Counts 3, 6, and 9 of the indictment charged the Defendant with statutory rape by an authority figure by cunnilingus, fellatio, and digital penetration, respectively. The Defendant contends that the State failed to show the Defendant used his position of trust to accomplish the sexual penetration.

The evidence, viewed in the light most favorable to the State, proved that the Defendant and the victim's mother began a long-term relationship when the victim was four years old. The Defendant assumed a parental role with the victim that continued despite the end of his relationship with the victim's mother when the victim was in the sixth-grade. The Defendant continued his relationship with the victim, providing her a room in his new residence, feeding and taking care of the victim when she would stay with him on weekends, and providing clothing and school supplies. The victim's mother allowed the continued contact based upon the Defendant's role as a father figure in the victim's life. It was due to this familial relationship that the victim was staying with the Defendant in November 2014, when she drove him to a medical appointment in Cookeville, Tennessee. On the return drive from the appointment, the Defendant provided lodging at a hotel, food, and personal necessities, for the "spur of the moment" stay in Knoxville. During the trip, the Defendant prevented the victim from speaking with her mother while he instead communicated with the victim's mother over the phone. This evidence supports the jury's verdict that the Defendant used his relationship as a father figure to isolate the victim in an out-of-town hotel room, convince the victim to "snort" oxycodone, and accomplish illegal sexual acts with the minor victim. The Defendant is not entitled to relief as to this issue.

### 3. Sexual Battery by an Authority Figure

The Defendant applies the same argument to his conviction for Count 12, sexual battery by an authority figure, for his conduct in touching the victim's breast. He argues

that the State failed to prove the Defendant used his position of trust to accomplish the acts.

Sexual battery by an authority figure, as charged in this case, "is unlawful sexual contact with a victim by the defendant or the defendant by a victim" where "[t]he victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age," and "[t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact." T.C.A. § 39-13-527(a). "Sexual contact" is "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id*. § 39-13-501(6). Additionally, " '[i]ntimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id*. § 39-13-501(2).

The evidence, viewed in the light most favorable to the State, proved that the Defendant assumed a parental role with the victim when she was four-years old. After his romantic relationship with the victim's mother ended, the Defendant continued to act as a father figure in the victim's life. It was due to this familial relationship that the victim was staying with the Defendant in November 2014, when she drove him to a medical appointment in Cookeville, Tennessee. On the return trip, the Defendant provided lodging at a hotel, food, and personal necessities, for the "spur of the moment" stay in Knoxville due to another medical appointment scheduled for the following day. Throughout the trip, the Defendant prevented the victim from speaking with her mother, while instead he communicated with the victim's mother over the phone. At the hotel the Defendant pressured the victim into taking his prescribed oxycodone. The victim felt drowsy due to the drugs and fell in and out of consciousness throughout the night. At one time, she awoke to find that she was naked and the Defendant was digitally penetrating her with one hand while touching her breast with the other. This evidence supports the jury's verdict that the Defendant used his relationship as a father figure to isolate the victim in an out-of-town hotel room, convince the victim to "snort" oxycodone, and accomplish illegal sexual acts with the minor victim. The Defendant is not entitled to relief as to this issue.

### B. Sentencing

The Defendant asserts that the trial court abused its discretion when it ordered partial consecutive sentencing because the effective twenty-year sentence imposed was "excessively punitive." The State responds that the trial court considered the appropriate factors and that the record demonstrates that the sentence is consistent with the statutory purposes and principles of sentencing. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

T.C.A. § 40-35-115. The criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing

principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432S.W.3rd 851, 860 (Tenn. 2013).

Among other documents, the victim impact statement was introduced at the sentencing hearing. In it, the victim talked about the long term effects of the Defendant's betrayal of the parental role he had held in her life. She identified the Defendant as her "number one support system" and outlined the sleep deprivation, nightmares, and resultant drug use to avoid "the pain and stress" in the wake of this incident. After the introduction of proof and arguments from the parties, the trial court found that the Defendant was a Range I, standard offender. The three convictions for rape, a Class B felony, had a sentencing range of eight to twelve years. The three convictions for statutory rape by an authority figure, a Class C felony, had a sentencing range of three to six years. The conviction for solicitation of a minor, a Class C felony, had a sentencing range of three to six years. The conviction for sexual battery by an authority figure, a Class C felony, had a sentencing range of three to six years and the casual exchange with a minor conviction, a Class C felony, had a sentencing range of three to six years. After considering, enhancement and mitigating factors, the trial court ordered the following sentences:

| Count 1 | Rape | 12 years |
|---------|------|----------|
| Count 3 | Statutory Rape | 6 years |
| Count 4 | Rape | 12 years |
| Count 6 | Statutory Rape | 6 years |
| Count 7 | Rape | 8 years |
| Count 9 | Statutory Rape | 6 years |
| Count 10 | Solicitation of a Minor | 6 years |
| Count 11 | Casual Exchange | 6 years |
| Count 12 | Sexual Battery | 6 years |

In considering consecutive sentencing, the trial court noted the specific facts of this case, the parent-child relationship that existed between the parties, the scope of the acts, and the extent of the damage to the victim. The trial court noted that the State requested that two of the rape convictions run consecutively for an effective sentence of twenty-four years. Considering the facts specific to this case, the trial court determined that twenty-four years would be "too much"; however, the circumstances of the case warranted more than twelve years. Thus, the trial court sentenced the Defendant to eight years rather than twelve years in Count 7, and ordered Count 7 to run consecutively to the

twelve-year sentence in Count 1.  Finally, it ordered the remaining sentences to run concurrently with Count 1, for a total effective sentence of twenty years.

We conclude that the record does not preponderate against the trial court's finding that partial consecutive sentencing was warranted in this case based upon the category of the offenses, the Defendant's relationship with the victim, the nature of the sexual acts, and the extent of the residual mental and emotional damage to the victim.  The record supports the trial court's finding that consecutive sentencing factor (5) applies.  Further, in declining to impose complete consecutive sentencing, the trial court considered whether consecutive sentencing was "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." *See* T.C.A. § 40-35-102(1), 103(2); *see also Imfeld*, 70 S.W.3d at 708.  As such, the trial court properly imposed consecutive sentencing in this case.  The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the evidence is sufficient to support the Defendant's convictions and the trial court properly imposed partial consecutive sentencing in this case.  As such, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE